**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------X
DOMINGO PIMENTEL,

            Petitioner,   :

            -against-       :

UNITED STATES OF AMERICA,    :

            Respondent.   :
------------------------------X

96 Civ. 5891 (JFK)
91 CR. 83 (JFK)
**MEMORANDUM OPINION & ORDER**

**JOHN F. KEENAN, United States District Judge:**

      Petitioner Domingo Pimentel ("Pimentel") moves <u>pro se</u> pursuant to Rule 60(b) of the Federal Rules of Civil Procedure for relief from this Court's denial of his habeas petition. For the reasons set forth below, the motion is denied.

**I. PROCEDURAL HISTORY**

      On January 29, 1991, the Government filed a three-count indictment against Pimentel, charging him with (1) interfering with the federally protected activities of a government informant by killing him, in violation of 18 U.S.C. § 245(b)(1)(B); (2) retaliating against the same informant by killing him, in violation of 18 U.S.C. § 1513(a)(2); and (3) jumping bail, in violation of 18 U.S.C. § 3146(a). The trial commenced on July 29, 1991 and concluded on August 2, 1991. The jury returned guilty verdicts against Pimentel on all three counts. He was sentenced to life imprisonment on count one, a concurrent term of ten years' imprisonment on count two, and fifteen months' imprisonment on count three to run consecutively to the other

1

sentences.

Pimentel filed a timely notice of appeal, and on October 23, 1992, the Second Circuit affirmed the conviction. See United States v. Pimental [sic], 979 F.2d 282 (2d Cir. 1992), cert. denied, 508 U.S. 956 (1993).

On August 15, 1996, Pimentel filed a habeas petition pursuant to 18 U.S.C. § 2255, seeking to vacate his conviction. Pimentel argued that the Government failed to disclose exculpatory evidence in violation of its obligations under Brady v. Maryland, 373 U.S. 83 (1963). The Court denied the petition in an opinion and order dated February 9, 1998 (the "Opinion and Order"), holding that there was no Brady violation because the Government did not possess the alleged exculpatory evidence at the time of trial, and that the evidence was not exculpatory. See United States v. Pimentel, Nos. 96 Civ. 5891, 91 CR. 83, 1998 WL 50142 (S.D.N.Y., Feb. 9, 1998).

On April 1, 1998, the Court rejected Pimentel's application for a certificate of appealability ("COA"). On October 26, 1999, the Second Circuit also denied Pimentel the COA, finding that he had failed to make a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2).

## II. FACTS

### A. The Counterfeiting Case

On August 8, 1988, a Government informant named Juan Andres Guerrero-Gonzalez ("Guerrero") identified Pimentel and his

2

common-law wife Ronna Deziel as potential sources of counterfeit currency.  The next day, while under the supervision of Secret Service agents, Guerrero met with Pimentel and Deziel in the Bronx and purchased approximately $5,000 in counterfeit currency using $1,000 in Secret Service undercover funds.  On August 12, 1988, again under the supervision of the Secret Service, Guerrero met again with Pimentel and Deziel in Joyce Kilmer Park in the Bronx to negotiate the sale of a large sum of counterfeit United States currency.  Upon Guerrero's signal to the Secret Service agents supervising these negotiations, agents converged upon the park and arrested Pimentel and Deziel.  Following these arrests, the agents recovered approximately $105,000 in counterfeit currency from the trunk of Pimentel's car, which was parked nearby.

On September 7, 1988, both Pimentel and Deziel were released on bail.  The conditions of the bail permitted Pimentel and Deziel to travel between the Southern District of New York and their home in Rhode Island.  On November 1, 1988, Pimentel and Deziel pleaded guilty to dealing in counterfeit obligations of the United States in violation of 18 U.S.C. § 473.  Both Pimentel and Deziel were continued on bail and ordered to appear for sentencing on January 4, 1989.  As Pimentel later stipulated while on trial for Guerrero's murder, he never appeared for sentencing as required by his release conditions.

**B. Guerrero's Murder**

The testimony at Pimentel's trial for Guerrero's murder established the following. Immediately after their arrest for currency counterfeiting in August 1988, Pimentel told Deziel that Guerrero was a "snitch" and that "he would kill him if he ever found him." After his release on bail in September 1988, Pimentel along with his brother and Deziel drove to what they believed to be Guerrero's home. Guerrero was not at home and Pimentel did not see Guerrero again until November 2, 1988-the day after Pimentel pleaded guilty to the counterfeiting charge.

On November 2, 1988, Deziel and Pimentel went to Merriam Avenue in the Bronx, in a neighborhood where Pimentel's relatives lived, and where Pimentel and Deziel often visited before their counterfeiting arrest. Deziel and Pimentel planned to travel on that day to their home in Rhode Island, but first stopped at the home of Pimentel's uncle. While Deziel used the phone to inquire about transportation back to Rhode Island, Pimentel went to 1304 Merriam Avenue, where his cousin lived. 1304 Merriam is located at the top of a hill, on the corner of 169th Street in the Bronx.

A couple of hours later, near dusk, Pimentel returned to his uncle's apartment for Deziel. The couple left Pimentel's uncle's apartment, leaving their luggage there, and returned to the second floor apartment of Pimentel's cousin at 1304 Merriam Avenue. After a short visit, Pimentel and Deziel left the

apartment, taking the stairs to the lobby area of the building. As they descended the stairs, Deziel saw Guerrero speaking with Mary Fitzpatrick, a woman Deziel knew from the neighborhood. Guerrero and Fitzpatrick were approximately 10-15 feet from the stairway in the front entrance to the lobby. Deziel was not certain if Pimentel, who was to her side and a few steps behind, had seen Guerrero. Deziel and Pimentel walked away from Guerrero. As they approached the side exit, which leads to 169th Street, the couple encountered Tara Ford, who lived in the building. After a brief conversation with Ford, Pimentel and Deziel left the building and walked up 169th Street toward Merriam Avenue.

Upon reaching the intersection of Merriam Avenue and 169th Street, the couple walked down the Merriam Avenue hill where they met Jose Contreras and his wife, Carmen, who were in Contreras's parked car. While Deziel spoke to Carmen, Pimentel approached Contreras and asked him about a red and yellow baseball bat that Pimentel had apparently spotted in the open trunk of the car. Contreras said that the bat was his and Pimentel then took the bat from the trunk. Holding the bat behind his back, Pimentel walked back up the hill to 1304 Merriam Avenue. Deziel and Contreras lost sight of Pimentel as he reached the intersection of Merriam Avenue and 169th Street, where the hill crests.

5

Approximately five minutes later, Deziel heard people screaming in the area of 1304 Merriam Avenue. When both she and Contreras looked in that direction, they saw Pimentel run down Merriam Avenue and throw the bat, which appeared to be broken, into an empty lot along Merriam Avenue. As Pimentel raced down the hill, Deziel caught up to him, and at the bottom of the hill at the intersection of Ogden Avenue, the couple entered a cab. Pimentel was in such a hurry as he ran down the hill that he ran past his uncle's apartment without stopping to pick up the luggage he and Deziel had left there. By 8:15 that evening, Pimentel and Deziel boarded a bus in Manhattan for Rhode Island.

About the time of the Guerrero murder, Margie Rodriguez, who lived across the street from 1304 Merriam Avenue, was returning home from a bodega on 169th Street. As she crossed the street in front of 1304 Merriam Avenue, Rodriguez saw Fitzpatrick in front of the building speaking to a young Hispanic man whose face she could not see because his back was towards her. As she continued to cross the street, Rodriguez saw Pimentel run up behind the Hispanic man, take a batter's stance, and strike Guerrero in the back of his head with a baseball bat. As she heard the crack of the bat, she saw Guerrero turn and fall to the ground, his hands never leaving his pockets. When Guerrero fell to the ground, Pimentel stood over his body and continued to smash his head with the bat approximately 15-20 times. As this occurred, Fitzpatrick ran screaming into the lobby

6

of 1304 Merriam, where she was met by Ford. Ford ran to the front entrance of the building to check on the commotion and saw Pimentel by the front stoop standing over Guerrero, beating him with the bat.

When the beating was over and Pimentel had run down the hill, Ford, Rodriguez, and Contreras approached Guerrero's body as he lay bleeding on the front stoop of the building. Minutes later, New York City Police Department ("NYPD") Officers and an ambulance arrived which took Guerrero to the hospital. He was pronounced dead later that evening. An assistant New York City medical examiner testified that virtually every bone in Guerrero's face and skull was shattered as a result of the beating, and that these injuries were consistent with at least seven blows from a baseball bat. Secret Service Agents recovered the bat on November 15, 1988, after a search of the Merriam Avenue lot.

Deziel and Pimentel returned to Rhode Island on the evening of the murder and continued to live together for another week. Deziel did not see Pimentel again until she identified him at trial. On June 22, 1990, Pimentel was located and arrested by Secret Service agents in San Juan, Puerto Rico. He was convicted on August 2, 1991 after a five-day trial.

### C. Pimentel's Habeas Petition

On August 5, 1996, Pimentel filed a petition pursuant to 28 U.S.C. § 2255 seeking to vacate his conviction on the

7

ground that the Government failed to turn over purported exculpatory evidence. Pimentel alleged that a woman by the name of Marisol Mangual witnessed the murder and informed the police that Pimentel was not the murderer. According to Pimentel, Mangual's testimony would have undercut the testimony of the numerous witnesses who testified on behalf of the Government. In support of this claim, Pimentel submitted a document purporting to be a transcript of an interview of Mangual by an investigator with the "Private Bureau of Investigation" on May 6, 1994 (the "Mangual transcript"). (Pet'r. Ex. A). Pimentel also submitted police reports which he claimed contained exculpatory information. The Court reviewed these reports and found that they did not contain exculpatory information. Thus, I only addressed the alleged information from Mangual.

In its Opinion and Order, the Court held that there was no Brady violation. The Court found that the Government did not possess the information from Mangual and that, even if it had, the information was "simply not credible" in the face of the overwhelming evidence of Pimentel's guilt adduced at trial. Pimentel, 1998 WL 50142 at **4-6.

The record indicated that the Government clearly did not possess the Mangual information. Both Assistant United States Attorney ("AUSA") David N. Kelley[1] and Special Agent

---

[1] Mr. Kelley later became the United States Attorney for the Southern District of New York.

Arnette F. Heintze submitted affidavits stating that the first time the Government became aware of the Mangual information was after Pimentel filed the habeas petition.  (Kelley Aff. ¶ 8-9; Heintze Aff. ¶ 8-9).  The only information they had about Mangual prior to Pimentel's submission of his habeas petition was a police report by a NYPD detective.  According to the report, Mangual stated that Mary Fitzpatrick had seen the homicide. The report gave no indication that Mangual witnessed the crime herself, nor did it contain any information exculpating Pimentel.  (Kelley Aff. ¶ 8; Heitze Aff. ¶ 8.)  Moreover, following the submission of Pimentel's petition, the Government obtained and reviewed all documents related to the case that could be located from the United States Attorney's Office, the United States Secret Service, and the NYPD. (Holtmeier Aff. ¶¶ 4-5, 6.)  No other documents indicated that Mangual was ever interviewed again or that she ever provided any additional information about the case. (Id. ¶ 7.)

The Court also found that, had the Government possessed and disclosed the Mangual information, there would not have been a reasonable probability that the outcome of the trial would have been different.  The record indicated that the Government produced four eyewitnesses to the crime.  Two witnesses, Margie Rodriguez and Tara Ford, actually saw Pimentel striking Guerrero with a bat as Guerrero was speaking with Mary Fitzpatrick.  The two other witnesses, Deziel and Contreras, saw Pimentel take the

9

bat from Contreras' car and go toward the site of the murder, and saw him running from the scene of the murder and throw the murder weapon into a nearby field-where Secret Service agents ultimately retrieved it. In addition, Contreras identified the bat recovered from the field.

Moreover, the circumstances of the murder corroborated the eyewitness testimonies. Pimentel had a strong motive to murder Guerrero because Guerrero was the informant who set Pimentel up for the counterfeiting arrest. Pimentel also specifically declared his desire to kill Guerrero; he was in the neighborhood at the time that Guerrero was killed; he fled the jurisdiction immediately after the murder and was in such a rush that he grabbed Deziel and hurried her away from the scene right after the murder and left their luggage behind. He also failed to appear for his sentencing on the counterfeiting charge on January 4, 1989, although he had been consistently been appearing for court as required by his bail conditions.

In contrast, the Mangual information was of very questionable authenticity and contradicted the testimony of the witnesses at trial. The accuracy of the information could not be verified because neither the interviewer nor Mangual provided supporting affidavits. In addition, the information stated that Mangual witnessed the murder, but did not see the murderer's face. Finally, the information indicated that Mangual stated that she saw Pimentel standing across the street from the murder

10

and that he was still standing there when the police came. However, "[t]here [was] no indication that she had ever seen Pimentel before and it was unclear as to why she focused on an allegedly uninvolved person across the street while a shocking murder and its aftermath occurred in front of her." Pimentel, 1998 WL 50142 at *6.

Moreover, Mangual's statement that Tara Ford, one of the eyewitnesses to the murder, was across the street during the murder, directly contradicted the testimony of both Ford and Deziel, who placed Ford in the building at the time of the killing. Finally, Mangual's claim that she told this story on more than one occasion to the police, who kept "bugging" her, was not substantiated.

The Court concluded that the Mangual information was not exculpatory within the meaning of Brady because "[w]hen viewed within the context of the mountain of overwhelming testimonial and physical evidence against Pimentel produced at trial, if the Government had known about Mangual's purported story and disclosed it to the defense at trial there is not a reasonable probability that the result of the trial would have been different." Pimentel, 1998 WL 50142 at *7.

### III. DISCUSSION

Pimentel now seeks Rule 60(b) relief from the 1998 denial of his habeas petition principally on three grounds. First, he claims that the Court applied an incorrect standard

11

when it considered his habeas petition. He asserts that he offered the Mangual transcript in support of his habeas petition as newly discovered evidence to prove his actual innocence. Therefore, according to Pimentel, the Court should have applied the standard set forth in Schlup v. Delo, 513 U.S. 298 (1995). Second, he claims that the Court denied him due process by deciding his habeas petition without first holding an evidentiary hearing. Finally, he has submitted a document purporting to be the "Declaration of Mary Fitzpatrick." He claims that this declaration is additional newly discovered evidence of his innocence and that the Government committed fraud and violated its Brady obligations by failing to disclose this evidence at trial.[2]

**A. Rule 60(b) Standard**

Rule 60(b) of the Federal Rules of Civil Procedure provides that:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

---

[2] Petitioner also submitted this declaration to the Court of Appeals in support of his unsuccessful application for a certificate of appealability. In denying the application, the Court of Appeals found that he had not made a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(2). To a large extent, Pimentel uses the instant Rule 60(b) motion to complain that the Court of Appeals erred in failing to issue the certificate. Obviously, a district court lacks authority to review this claim.

12

> (4) the judgment is void; (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b). "'A motion under Rule 60(b) is addressed to the sound discretion of the trial court.'" Scherer v. City of New York, No. 03 Civ. 8445 (RWS), 04 Civ. 2713 (RWS), 2007 U.S. Dist. LEXIS 68139, at *9 (S.D.N.Y. Sept. 7, 2007) (quoting Velez v. Vassallo, 203 F. Supp. 2d 312, 333 (S.D.N.Y. 2002)). However, the Second Circuit has cautioned that "Rule 60(b) provides 'extraordinary judicial relief' to be granted 'only upon a showing of exceptional circumstances.'" Id. at *9 (quoting Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986)). "Such circumstances will rarely occur in the habeas context." Gonzalez v. Crosby, 545 U.S. 524, 535 (2005). "In evaluating a Rule 60(b) motion, the courts of this circuit require that the evidence in support of the motion be highly convincing, that the movant shows good cause for the failure to act sooner, and that no undue hardship be imposed on the other parties as a result." Scherer, 2007 U.S. Dist. LEXIS 68139 at *9-10.

**B. Analysis**

    1. Pimentel's Motion is Time-Barred

Rule 60(b) requires that any motion made under subsections (1), (2) and (3) be made within one year of the judgment, order or proceeding from which the movant seeks relief. Fed. R. Civ. P. 60(c)(1). To the extent that Pimentel's motion

13

relies on claims of mistake, fraud or newly discovered evidence, such claims are untimely. This Court entered its Opinion and Order denying Pimentel's habeas petition on February 10, 1998. Pimentel filed this motion more than nine years after the order was entered, eight years too late.

Even reading Pimentel's claims under subsection (6), but see Scherer, 2007 U.S. Dist. LEXIS 68139 at *11 ("A party may not depend on the broad 'any other reason' provision of Rule 60(b)(6) where the basis for the Rule 60(b) motion may be construed under any other clause of Rule 60(b)), the motion is still untimely. Motions pursuant to subsection (b)(6) must be brought within a "reasonable time." Fed. R. Civ. P. 60(c)(1). As stated above, Pimentel brought this motion more than nine years after the order denying his habeas petition was entered. Nine years does not constitute a reasonable time. See Kellogg v. Strack, 269 F.3d 100, 104 (2d Cir. 2001) (two-year delay unreasonable); Rodriguez v. Mitchell, 252 F.3d 191, 201 (2d Cir. 2001) (three and a half year delay unreasonable); Truskoski v. ESPN, Inc., 60 F.3d 74, 77 (2d Cir. 1995) (eighteen-month delay unreasonable); LaFontaine v. Comm'r of Corr. Servs., 96 Civ. 9308, 2005 U.S. Dist. LEXIS 9630 at *8 (S.D.N.Y. May 17, 2005) (seven-year delay unreasonable).

    2. Pimentel's Claims Lack Merit

        *a. The Court Applied the Correct Standard to the Habeas Claim*

14

In reviewing Pimentel's § 2255 petition, this Court correctly applied the standard governing Brady claims: whether the prosecution possessed and failed to disclose the purported exculpatory information and whether "there [was] a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 435 (1995); United States v. Bagley, 473 U.S. 667, 682 (1985). As described above, the Court ruled that the Government did not possess any exculpatory information and that, in light of the "mountain of overwhelming testimonial and physical evidence against Pimentel produced at trial," Pimentel, 1998 WL 50142 at *7, there was no reasonable probability that the result of the trial would have been different had the Mangual information been disclosed.

To the extent Pimentel argues that the Court should have interpreted his habeas claim as one of actual innocence based on the newly discovered Mangual transcript, this argument also fails. In Herrera v. Collins, 506 U.S. 390, 400 (1993), the Supreme Court stated that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." See also Greene v. Walker, No. 98 2149, 1999 WL 1489805, at *1 (2d Cir. Dec. 29, 1999) (citing Herrera and holding that a claim of actual innocence, standing alone, "fails to demonstrate a

15

constitutional defect that would undermine the underlying conviction"). District courts, following Herrera, have repeatedly held that a "freestanding" claim of actual innocence based on newly discovered evidence, i.e., one unaccompanied by an allegation of some constitutional error, does not provide a basis for habeas relief. See, e.g., Bravo v. Couture, No. 98 CV 8050, 2003 WL 22284147, at *4 (E.D.N.Y. Aug. 21, 2003) (Weinstein, J.) ("Habeas corpus review does not extend to 'freestanding claims of actual innocence.'" (quoting Herrera)); Arce v. Commissioner of Correctional Services, No. 06 CV 5573, 2007 WL 2071713, at *4 (E.D.N.Y. July 17, 2007) ("Courts in this Circuit have repeatedly held that claims of innocence without reliance on constitutional infirmities in the trial do not present a ground for federal habeas corpus relief."); Edwards v. United States, No. 05 CV 0017, 2005 WL 1522743 at *3 (E.D.N.Y. June 27, 2005) ("Petitioner fails to articulate a constitutional deprivation cognizable under Section 2255 relating to his claim of newly discovered evidence. This in itself is sufficient basis to deny the habeas corpus petition."); Townes v. Lacy, 99 Civ. 9635, 2001 WL 682452, at *3 (S.D.N.Y. June 18, 2001) (holding that a post-conviction affidavit asserting petitioner's innocence does not "constitute a factual predicate for a new constitutional claim. Moreover, evidence of [petitioner's] innocence ... cannot serve as an independent basis for habeas relief"). Had the Court construed Pimentel's habeas claim as one of actual innocence claim rather

than a Brady violation, that claim would not have been cognizable.

Pimentel incorrectly asserts that the Supreme Court's decision in Schlup v. Delo, 513 U.S. 298 (1995) entitles him to habeas relief on a freestanding actual innocence claim. In Schlup, the Supreme Court held that a claim of actual innocence may excuse a procedural bar and allow the court to consider the habeas petition's underlying claims. If the petitioner can show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence," id. at 327, then Schlup provides a "gateway" to reach the merits of the otherwise procedurally-barred petition. Id. at 315-316. In Schlup, the actual innocence claim opened this gateway and permitted consideration of underlying constitutional trial errors—ineffective assistance of counsel and a Brady violation— which provided a basis for habeas relief. Id. Schlup did not address whether a claim of actual innocence, standing alone, could entitle a petitioner to habeas relief.

The Supreme Court recently stated in House v. Bell that Herrera left open the possibility that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." House v. Bell, 547 U.S. 518, 554 (2006) (quoting Herrera, 506 U.S. at 417). In describing

17

this "hypothetical freestanding innocence claim," the Court in House noted that the burden of proving it "would necessarily be extraordinarily high" and would "require[] more convincing proof of innocence than Schlup." Id. at 554-555. Even if the claim hypothesized in Herrera and House might also exist in the non-capital context, Pimentel could not come close to meeting its "extraordinarily high" standard. As the Court found in its Opinion and Order, there was no reasonable probability that the Mangual information, if introduced as evidence at Pimentel's trial, could have led to his non-conviction. It necessarily follows that Pimentel could not have shown that "it is more likely than not that no reasonable juror would have convicted him" in light of that evidence. Schlup v. Delo, 513 U.S. 298 (1995). Therefore, Pimentel could not have obtained habeas relief under a claim of actual innocence.

    *b. The Court Did Not Err in Denying the Habeas Petition Without a Hearing*

Pimentel also claims that his due process rights were violated because he was not granted an evidentiary hearing on the habeas petition, therefore the Opinion and Order is void under Rule 60(b)(4). See Grace v. Bank Leumi Trust Co., 443 F.3d 180, 193 (2d Cir. 2006) ("A judgment is void under Rule 60(b)(4) of the Federal Rules of Civil Procedure . . . if the court that rendered it . . . acted in a manner inconsistent with due process of law." (quotations and citations omitted)). This argument also

fails.  The Court decided Pimentel's habeas petition after reviewing affidavits submitted by the trial prosecutor and FBI investigator involved in the case, the police reports, and the Mangual transcript.  This documentary evidence conclusively established that the Government possessed no exculpatory evidence to disclose, and that there was no reasonable probability that the Mangual information would have made a difference in light of the powerful and overwhelming evidence against Pimentel.  Consequently, there was no need to hold a hearing. See Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001) (district court has discretion to rely on documentary evidence in deciding habeas petition, and need not conduct a "full-blown testimonial hearing" when in-court testimony "would not offer any reasonable chance of altering [the Court's] view of the facts").

*c. Petitioner's Claim of Newly Discovered Evidence Does Not Challenge the Integrity of the Habeas Proceeding*

Pimentel has attached to his Rule 60(b) motion a document purporting to be the "Declaration of Mary Fitzpatrick," which he offers as additional newly discovered evidence that he had not presented to the Court in his habeas petition.  To the extent that Pimentel argues that this declaration is proof of his innocence and that the government violated Brady by failing to disclose it, a Rule 60(b) motion is the wrong vehicle to bring these claims.  Rule 60(b) is "only available with respect to a previous habeas proceeding when the motion challenges the

19

integrity of the habeas proceeding. The rule cannot be used to attack the underlying criminal conviction." Grullon v. United States, 99 Civ. 1877, 2004 U.S. Dist. LEXIS 16878 at *10 (S.D.N.Y. Aug. 24, 2004); see also Harris v. United States, 367 F.3d 74, 77 (2d Cir. 2004). Any attack on his conviction based on this declaration must be brought through a second habeas petition, and Pimentel must first move in the Court of Appeals for an order authorizing me to consider a second petition.³ See 28 U.S.C. § 2255.

## CONCLUSION

For the foregoing reasons, the Rule 60(b) motion is denied.

**SO ORDERED.**

**Dated:**           **New York, New York**
                    **May 21, 2008**

                                 *[signature]*
                                 **JOHN F. KEENAN**
                              **United States District Judge**

---

³ As noted above, the Court of Appeals already reviewed this purported declaration in October 1999 when it refused to issue Pimentel a certificate of appealability from the denial of his first habeas petition, finding that he had failed to make a substantial showing of the denial of a constitutional right.